UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

DAVID W. SHERBROOKE,

        Plaintiff,

v.

**ORDER & MEMORANDUM**
Civil File. No. 05-671 (MJD/RLE)

THE CITY OF PELICAN RAPIDS,
SCOTT SACHS, SCOTT FOX and
TED LEABO,

        Defendants.

---

Kyle E. Hart and Kristine Kroenke, Fabyanske, Westra, Hart & Thomsom P.A.,
Counsel for Plaintiff.

Jason M. Hiveley and Jon K. Iverson, Iverson Reuvers LLC, Counsel for
Defendants.

---

## I.  INTRODUCTION

This matter is before the Court on Plaintiff David W. Sherbrooke's Motion

for Partial Summary Judgment [Docket No. 24] and on Defendants the City of

Pelican Rapids, Scott Fox, Scott Sachs and Ted Leabo's Motion for Summary

Judgment [Docket No. 41].  Oral argument was heard on September 8, 2006.

## II.    FACTUAL BACKGROUND

### A.    The Parties

Plaintiff David W. Sherbrooke ("Sherbrooke") is a Minnesota citizen who resides in Pelican Rapids, Minnesota.  He was arrested and charged with Fourth Degree Driving While Impaired ("DWI") in violation of Minn. Stat. § 169A.20 and Carrying a Weapon in violation of Minn. Stat. § 624.7142.  (Compl. at ¶¶ 4, 13; Sachs Aff. Ex. B.)  The Defendants are the City of Pelican Rapids ("City"), Scott Fox ("Fox"), Scott Sachs ("Sachs"), and Ted Leabo ("Leabo").  At all times relevant hereto, Fox, Sachs, and Leabo were police officers employed by the City and were Minnesota residents.  (Compl. at ¶¶ 5-8.)  At the time of Sherbrooke's arrest, Fox was the Chief of Police, Sachs was the arresting police officer, and Leabo was acting as backup to Sachs.

### B.    The Stop

Sherbrooke attended his high school class reunion on July 24, 2004, at the VFW in Pelican Rapids, Minnesota.  (Sherbrooke Dep. 42.)  From the time of about 10:30 p.m. to 12:25 a.m., when he left the VFW, Sherbrooke consumed four alcoholic beverages, each containing a shot of whiskey.  (Id. at 48-50, 73.) He then drove along Highway 59 and pulled over to the side of the road to look up a phone number.  (Id. at 52.)  While he was on the side of the road, he activated his four-way hazard lights ("hazards").  (Id.)

When he pulled away from the shoulder and continued driving on Highway 59, Sherbrooke claims that he kept his hazards on until he hit the posted speed limit and then turned them off.  (Id. at 52, 56.)  At that time, Sherbrooke observed a marked squad car ahead of him.  (Id. at 59-60.)  Sachs was in the squad car performing routine patrol and was at a stop sign ready to enter Highway 59 when Sherbrooke noticed him.  (Sachs Dep. 30, 32.)  Shortly after Sherbrooke passed the squad car, Sachs pulled out behind Sherbrooke, followed him for about 25 seconds, and then activated his overhead lights.  (Sachs Dep. 33; Sherbrooke Dep. 64.)  Sherbrooke turned on his right blinker and pulled over onto the side of the highway.  (Hart Aff. Ex. B at 35.)  Sachs claims he stopped Sherbrooke because the hazards were still activated as Sherbrooke passed him on the highway and he wondered if there was an emergency he could assist.  (Sachs Dep. 33.)  Sachs also claims the hazards were still going when he pulled Sherbrooke over.  (Id. at 36, 143; Hart Aff. Ex. B at 29.)

Before Sachs could exit his squad car, Sherbrooke got out of his truck and Sachs announced over his public address microphone for Sherbrooke to get back into his vehicle.  (Sachs Dep. 37; Sherbrooke Dep. 108.)  Sachs claims he did this for both his own and Sherbrooke's safety.  (Sachs Dep. 37; Hart Aff. Ex. B at 22, 36.)  Sachs testified that he is not sure if he ran Sherbrooke's license plate through dispatch before approaching Sherbrooke's truck.  (Sachs Dep. 40.)  However, Sherbrooke claims that Sachs waited four minutes before approaching

3

Sherbrooke's truck.  (Id. at 108.)  When Sachs approached Sherbrooke's truck, Sherbrooke voluntarily said, "I think I know why you stopped me" and went on to say he thought he was stopped because his hazards were activated.  (Sachs Dep. 42; Sherbrooke Dep. 104-105; Hart Aff. Ex. B at 31.)  Sachs claims he never got the chance to ask Sherbrooke what his emergency was because of this voluntary statement.  (Hart Aff. Ex. B at 12.)  Sachs then ran Sherbrooke's driver's license through dispatch as Leabo arrived on the scene.  (Sachs Dep. 46.)

While Sherbrooke was talking, Sachs detected a moderate odor of alcohol emanating from Sherbrooke's breath and looked for signs of impairment.  (Id. at 45; Hart Aff. Ex. B at 12; Sherbrooke Dep. 73.)  He noticed Sherbrooke had watery eyes.  (Sachs Dep. at 45.)  Sachs asked Sherbrooke to perform three standard field sobriety tests, which he is trained to administer.  (Sachs Dep. 46-47; Sachs Aff. Ex. A.)  These tests are subjective in nature.  (Fox Dep. 20; Hart Aff. Ex. F.)  The first test Sachs administered was the Horizontal Gaze Nystagmus test.  (Sachs Aff. ¶ 19.)  Sachs claims Sherbrooke failed this test because he "showed a lack of smooth pursuit in both eyes, distinct nystagmus at maximum deviation and onset of nystagmus prior to forty five degrees in both eyes."  (Id. at 20.)  Sachs then administered the walk and turn test, which Sachs claims Sherbrooke failed because he began before being asked to and because he was unsteady, using his arms for balance.  (Id. at 21-22.)  The third test Sachs administered was the one leg stand test.  (Id. at 23.)  Sachs claims Sherbrooke

4

failed this test because "he did not look at his toes as instructed, he swayed from side to side and used his arms for balance." (Id. at 25.) Sachs also noted that Sherbrooke started this test before he was told to, switched legs, and dropped his foot after about twenty eight seconds. (Id. at 24, 26; Hart Aff. Ex. A at 5.) Leabo claims his job while Sachs administered these standard field sobriety tests was to make sure both Sachs and Sherbrooke remained safe. (Leabo Dep. 19.) Throughout the tests, Sherbrooke was polite and cooperative. (Id. at 47-48; Leabo Dep. 22.)

Sachs then administered a Portable Breath Test ("PBT"), which resulted in a .11 blood alcohol level. (Sachs Aff. at ¶ 27; Sachs Dep. 55; Sherbrooke Dep. 74; Hart Aff. Ex. F.) At the time, the legal blood alcohol limit in Minnesota was .10. When Sherbrooke asked for his results, Sachs told him the machine read pass/fail, although the machine actually gave a digital reading. (Id. at 57-59; Hart Aff. Exs. A, D.) Sachs claims he did not want Sherbrooke to know his actual reading because Sachs did not want people calculating in their mind how to blow into the Intoxilyzer 5000 ("Intoxilyzer"), the machine used to administer the alcohol breath test at the Police Department. (Sachs Dep. 60.) Sachs then arrested Sherbrooke for suspicion of DWI and transported him to the Police Department. (Sachs. Aff. at ¶¶ 28-29.)

### C.      Vehicle Search Incident to Arrest

Once Sherbrooke consented to the police parking his car rather than having it towed, Leabo performed a vehicle search incident to the arrest.  (Sachs Dep. 112, 114; Leabo Dep. 24-26.)  This is standard procedure for the Pelican Rapids Police Department.  (Fox Dep. 38; cf. Hart II Aff. Ex. B at 5.)  A search incident to arrest involves searching "the immediate area of the driver's area of the cab of the pickup, anything within reaching or lunging distance of the driver's seat."  (Leabo Dep. 24.)  During his search, Leabo found a 40 caliber model .22 Glock in the driver's door compartment.  (Id. at 25-26; Sachs Aff. at ¶ 38.)  Sherbrooke claims he did not know he was carrying a loaded Glock.  (Sherbrooke Dep. 83, 127; Hart Aff. Ex. A at 17.)  He had a permit to carry.  (Sherbrooke Dep. 83.)

### D.      Events at the Police Department

At the Police Department, Sherbrooke consented to receiving a breathalyzer test.  (Sachs Aff. at ¶¶ 33-34.)  Sherbrooke claims he then asked for a drink of water and was told he could not drink out of the drinking fountain, but instead needed to drink from a cup.  (Sherbrooke Dep. 54.)  He claims Sachs provided him with a warm, but not hot, cup of water, which he drank.  (Id. at 93.)  Sachs claims he did not give Sherbrooke any water from the time of the arrest until after administering the Intoxilyzer test.  (Sachs Dep. 105.)  If Sherbrooke had been given water that was above normal body temperature close to the administration

of the Intoxilyzer test, the result of the test would have been artificially high. (Hart. Aff. Ex. F; Kierzek Aff. Ex. A)

After that, Sachs decided to turn on the videotape and audiotape in the Police Department, which is "standard operating procedure," according to Sachs and Leabo. (Sachs Dep. 97-99; Leabo Dep. 28.) Both Fox and the city attorney were aware of this procedure. (Fox Dep. 24-25.) Fox claims the videotaping is done to document the Intoxilyzer procedure and the audio just happens to be on the camera. (Id. at 26.)

Sherbrooke then chose to exercise his right to speak to an attorney and was provided a phone to do so. (Hart Aff. Ex. A at 14.) Sachs and Leabo were present during the conversation and both Plaintiff and the attorney knew they were present because Sachs would often make comments in regards to the conversation and would answer Sherbrooke's questions. (Id. at 15-18.) Sherbrooke also asked towards the end of the conversation, "so we're being taped here, right?" and when told yes he said "that's fine." (Id. at 29.) Sachs later deposed, "I may have heard conversing that's going on, but I have no interest in what his conversation was with his attorney." (Sachs Dep. 104.)

It was later discovered Sherbrooke could have been provided a private room while conversing with his attorney. (Fox Dep. 27.) Sachs claims a private conversation would not have been advisable since the building was not internally secure. (Sachs Dep. 100-04.) Sachs also claims he needed to have face-to-face

observation of Sherbrooke before administering the Intoxilyzer test to ensure Sherbrooke did not put anything in his mouth.  (Id.)

Sachs then administered the Intoxilyzer test, which required Sherbrooke to give two breath samples into the machine.  (Hart Aff. Ex. A at 21.)  For each breath sample, Sherbrooke had to blow at least 1.1 liters of air.  (Hart Aff. Ex. F; Kierzek Aff. Ex. A.)  Sherbrooke blew 4.0 liters of air into the machine for the first breath sample and 3.1 liters for the second breath sample.  (Hart Aff. Ex. F.) While Sachs administered the Intoxilyzer test, he could see the amount of air Sherbrooke was blowing and could see the alcohol content rise as the amount of air liters increased.  (Sachs Dep. 66.)  It is disputed whether Sachs administered this test properly.  (Id.; Kierzek Aff. Ex. A.)  Sherbrooke claims that Sachs intentionally manipulated the breathalyzer procedure by warning him that by not blowing hard enough he would be charged with a misdemeanor, and by having him breathe for a longer period than necessary to inflate the results of the test. (Sachs Dep. 64-68; Burr Report at 2.)  The Intoxilyzer test results were a blood alcohol level of .10, which was at the legal limit.  (Sachs Aff. at ¶¶ 33-34.)

### E.    Events at the Lake Region Hospital

As permitted by Minnesota Statute 169A.51(b), Sherbrooke decided to obtain a blood test at his own expense and Sachs transported him to Lake Region Hospital in Fergus Falls.  (Sherbrooke Dep. 85-86; Sachs Aff. at ¶ 6.)  Sherbrooke did not object to being brought to that particular hospital.  (Sherbrooke Dep. 86.)

The test administered at the hospital was later discovered to be a blood serum test, which is inadmissible in court.  (Hart Aff. Ex. J ¶ 3.)  A serum blood alcohol test provides a higher reading than a legally admissible blood alcohol test.  (Hart Aff. Ex. J ¶ 3.)  Sachs claims he did not know the blood tests at Lake Region Hospital were inadmissible in court.  (Sachs Dep. 85-86.)  The blood serum test resulted in a .102 blood alcohol level.  (Id. at 92.)  Lake Region Hospital is generally provided with a blood alcohol "kit" from the police department for a legally admissible test.  The hospital then sends the blood to the Bureau of Criminal Apprehension (BCA) for the actual testing.  (Id. at 4; Sachs Dep. 86.)  Sachs testified that if he wanted a valid blood test he "would take a State certified blood drop kit to the hospital with my prisoner and then they fill out the appropriate paperwork would be sent to the BCA and the results would be sent back to me."  (Id.)

### F. Videotape from the Squad Car

Sherbrooke's stop and arrest was recorded by a windshield-mounted video recorder in Sach's squad car, which began recording automatically when Sachs activated the car's overhead lights to pull over Sherbrooke.  (Sachs Dep. 16, 18.)

After his arrest, Sherbrooke hired an investigator who requested a viewing of the videotape of the stop and arrest.  The investigator noticed that in the videotape, Sherbrooke's hazards were not on as Sach's pulled behind Sherbrooke, followed him down the highway for about 2700 feet, and pulled him over.

(Implied Consent Transcript at 37-43.)  The investigator requested a copy of the videotape from Defendants, which was provided.  However, approximately 1.5 minutes were erased from the tape, including the portion of the tape that showed Sachs pulling behind, following and stopping Sherbrooke.  (Id. at 23-24.) Defendants claim that the tape was accidentally erased.

### G.    Evidence of Contests

Sherbrooke claims that he was pulled over because Sachs was involved in a contest with other officers to see who could make the most DWI arrests.  Sachs and Leabo stopped another car shortly before stopping Sherbrooke and the driver of the other car had an open bottle—but tested .00 in the PBT.  (Sachs Dep. 148-49.)  The officers let the driver go and said, "Let's go get a keeper."  (Id.)  Former Chief of Police Ballard testified that when he was the Police Chief, then-officer Fox engaged in contests to see who could get the most DWI citations and that he overheard radio contact between officers stating "I got another one—I'm one up." (Ballard Dep. 4-5.)  Ballard directed Fox that he should not be broadcasting over the police radio about this.  (Id.)  Sherbrooke also claims that he was targeted because Chief of Police Fox hated him.  Sherbrooke's friend, Jim Severson, testified that in August 2004, after Sherbrooke's arrest, Fox said to Sherbrooke, "David, you know I've always hated you, don't you?"  (Severson Aff. ¶ 5.)

The charges against Sherbrooke were eventually dropped and Sherbrooke was not prosecuted.

### H.    Current Action

Sherbrooke's Complaint alleges eight claims against the City and the Individual Defendants: Count I: Violation of Constitutional rights pursuant to 42 U.S.C § 1983, Count II: Conspiracy in violation of 42 U.S.C. § 1985, Count III: False Arrest, Count IV: Malicious Prosecution, Count V: Negligent Infliction of Emotional Distress, Count VI: Violation of Minn. Stat. § 481.10, Count VII: Common Law Conspiracy, and Count VIII: Vicarious Liability.  Sherbrooke voluntarily withdrew Counts II and V.  (See Pl.'s Resp. Mem. 31, 34.)

On May 31, 2006, Sherbrooke filed a Motion for Partial Summary Judgment as to Counts I and VI.  On June 1, 2006, Defendants filed a Motion seeking Summary Judgment on all claims.

## III.    DISCUSSION

### A.    Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion."  Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation

omitted).  "The filing of cross-motions does not concede the absence of a triable issue of fact.  The court is bound in such cases to deny both motions if it finds . . . there is actually a genuine issue of material fact."  <u>Jacobson v. Maryland Cas. Co.</u>, 336 F.2d 72, 75 (8th Cir. 1964).

**B.    Count I: Violations of Section 1983**

Plaintiff moves for partial summary judgment as to the claim contained in Count I: violation of Section 1983, for violations of his Fourth, Fifth, and Fourteenth Amendment rights by the City and the Individual Defendants, relating to the audio and video recording of his telephone conversation with his attorney.

Defendants move for summary judgment as to Count I in its entirety. Defendants argue that the Individual Defendants are subject to qualified immunity, that the City is not vicariously liable for unconstitutional acts by the individual Defendants, and that the Section 1983 claims are insufficiently pled.

**1.    Adequate Pleading**

Defendants claim that because Section 1983 does not itself provide a cause of action, Count I should be dismissed.  According to Defendants, Sherbrooke did not adequately plead violations of his civil rights because the Complaint resorts to "shotgun style" assertions of violations of First, Fourth, Fifth, Sixth Amendment rights and the right to due process under the Fourteenth Amendment, without offering a legal basis for each claim.  Defendants further argue that the claims

against the City arising from the recording of Sherbrooke's conversation with his attorney are not pled in the Complaint.

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . .

42 U.S.C. § 1983.  There is no heightened pleading standard for section 1983 claims; a plaintiff must simply provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993) (citation omitted); see also Harris v. St. Louis Police Dept., 164 F.3d 1085, 1086-87 (8th Cir. 1998).

When bringing a section 1983 claim a plaintiff must establish (1) a deprivation of a right secured by the Constitution or laws of the United States and (2) that the deprivation was committed under color of state law.  Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982).  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  Graham v. Connor, 490 U.S. 386, 393-94 (1989) (citation omitted).  Sherbrooke asserts that Defendants violated his constitutional

rights by stopping him without probable cause, and by audio and videotaping his conversations with his attorney.

The Complaint alleges that Defendants "acted under color of state law to knowingly and willfully deprive Sherbrooke of his right to freedom from unreasonable search and seizure . . . the right to effective assistance of counsel and the right to due process, all in violation of the First, Fourth, Sixth and Fourteenth Amendments."  (Compl. ¶ 23.)  The Complaint continues, "Sachs allowed Sherbrooke to make a call to his attorney, but then illegally videotaped Sherbrooke's privileged telephone conversation with his attorney."  (Compl. ¶ 11.) The Complaint further alleges that "the City tolerated, permitted, condoned, ratified, and failed to correct the tortious and illegal practices of its Police Department and Fox, Sachs and Leabo."  (Compl. ¶ 24.)  Defendants' motion to dismiss Sherbrooke's Section 1983 claims as insufficiently pled is denied, because the foregoing statements in the Complaint gave Defendants notice of Sherbrooke's Section 1983 claims against the City and the individual Defendants as well as the factual basis for those claims.

### 2. Qualified Immunity

Defendants argue that qualified immunity shields Sachs, Leabo and Fox from liability under Section 1983.  The purpose of qualified immunity is to "allow public officers to carry out their duties as they believe are correct and consistent with good public policy, rather than acting out of fear for their own personal

financial well being." Sparr v. Ward, 306 F.3d 589, 593 (8th Cir. 2002). Where a government official is sued in his individual capacity, the official is protected from liability by qualified immunity where the official's conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

In evaluating a motion for summary judgment on qualified immunity grounds, the Court must examine the claim under a three-pronged analysis by inquiring whether the plaintiff has (1) asserted a violation of a constitutional right; (2) demonstrated that the right is clearly established; and (3) raised a genuine issue of material fact as to whether a reasonable official would have known that his alleged conduct violated the plaintiff's established right. Lambert v. City of Dumas, 187 F.3d 931, 935 (8th Cir. 1999).

> **a.    Defendants' Motion for Summary Judgment on Count I: Violation of Fourth Amendment for Unreasonable Seizure**

In this case, the Fourth Amendment protection against unreasonable seizures of the person provides a clearly established right to be free from stop without probable cause. Thus, the Court must examine whether Sherbrooke has raised a genuine issue of material fact as to whether the officers should have known that their alleged conduct violated Sherbrooke's established right to be free from unreasonable seizure.

Defendants argue that Sachs had probable cause to stop Sherbrooke. It is undisputed, Defendants assert, that Sherbrooke drove down the highway with his hazards on and that Sachs pulled him over to see if there was an emergency. Thus, Defendants claim, Sachs was engaging in the "community caretaker function" as set forth in the Supreme Court's <u>Cady v. Dombrowski</u> opinion. 413 U.S. 433, 441 (1973). Accordingly, Defendants argue that it was reasonable for Sachs to stop Sherbrooke to determine the nature of the emergency. Then, once Sachs detected the odor of alcohol, it was reasonable for him to investigate and arrest Sherbrooke for a DWI.

In the alternative, Defendants argue Sachs had probable cause to stop Sherbrooke for violation of Minnesota Statute 169.64, Subdivision 3, which prohibits the use of hazards except to indicate the "presence of a vehicular traffic hazard requiring unusual care in approaching, overtaking, and passing." Defendants assert that it is important to note that probable cause need only be arguable and that any traffic violation, however minor, is grounds for a stop. Defendants also claim that if probable cause exists, any ulterior motive on the officer's part is irrelevant.

Sherbrooke counters that Defendants' argument that Sachs was acting under the community caretaker function is contradicted by the facts. Sherbrooke notes that Sachs ordered him back in his vehicle instead of asking him if there was an emergency. He also claims that Sachs waited four minutes before even

16

approaching his vehicle.  According to Sherbrooke, this evidence shows that Sachs was not concerned about a possible emergency when he stopped Sherbrooke.

Sherbrooke also argues that Sachs did not have probable cause to stop him for violation of Minnesota Statute 169.64, Subdivision 3, because he did not violate the statute.  Sherbrooke asserts that he used his hazards as the statute prescribes—to warn other cars of a vehicular traffic hazard—because as he pulled off the road he was traveling at a rate of speed slower than the posted speed limit. Sherbrooke points to the videotape viewed by his investigator, which showed that his hazards were not on at the time he was pulled over.  Combined with the evidence of DUI arrest "contests," this evidence contradicts Defendants' assertion of probable cause to stop Sherbrooke.  Thus, Sherbrooke claims that the stop was entirely pretextual, in violation of the Fourth Amendment.

Police officers often engage in activities to help those in danger and to protect property as part of the officer's "community caretaking functions."  United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006) (citing Cady v. Dombrowski, 413 U.S. at 441.)  Thus, an officer may execute a stop without a warrant where the officer has a reasonable belief that an emergency exists. Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (applying community caretaker doctrine to seizure of a person.)  In determining applicability of this exception to the warrant requirement, the Supreme Court has held that the

standard is whether the officer has a reasonable belief that an emergency exists. Mincey v. Arizona, 437 U.S. 385, 392-93 (1978).

In Quezada, the Eighth Circuit acknowledged that the "reasonable belief" standard, which is less exacting than the probable cause standard, has led to some concern that police officers might use the community caretaking exception as pretext.  The Quezada opinion then recognizes that the Ninth Circuit has created a test that requires examination of the subjective motivations of the officer in determining whether the exception should apply.  Quezada, 448 F.3d at 1007 (citing United States v. Cervantes, 219 F.3d 882, 890 (9th Cir. 2000)). Ultimately, Quezada fails to reach the issue of whether the officer's subjective intent should be determined in a case such as this one: "But we do not have to decide the legal relevance, if any, that the subjective intent of the officer in the present case because the district court found on an ample record that Deputy Ruth entered the apartment to investigate a possible emergency situation."  Id. at 1008. In this case, the Court does not need to decide whether to weight Sachs' subjective intent because a fact issue remains as to whether Sachs' actions were objectively reasonable.

Viewing the facts in the light most favorable to Sherbrooke, there is a fact issue as to whether Sach's belief that an emergency existed was objectively reasonable because there is evidence that Sherbrooke turned off his hazards as soon as he spotted Sachs, and that Sachs followed him for about 25 seconds, with

18

his hazards off, before pulling him over.  This evidence contradicts Defendants'
argument that Sachs' belief that an emergency existed was objectively reasonable.
In addition, if subjective intent is a factor to be considered in this Circuit, there is
a genuine fact issue as to Sach's motivations in stopping Sherbrooke.

As to Defendants' claim that Sachs stopped Sherbrooke for a minor traffic
violation, the Court also finds an issue of material fact has been raised.  Pretextual
stops are a violation of the Fourth Amendment.  United States v. Eldridge, 984
F.2d 943, 947 (8th Cir. 1993).  However, it is well-settled that an officer
observing a traffic offense, however minor, has probable cause to stop a vehicle.
Id.   In determining whether a stop was solely pretextual, the Court must
objectively assess the officer's action in light of the facts and circumstances then
known to him.  Id.  Whether a traffic stop is pretextual is a question of fact.  Id.;
Hill v. Scott, 349 F.3d 1068, 1071-72 (8th Cir. 2003).

There is a genuine issue of material fact because the parties do not agree
that Sherbrooke violated the statute.  This is a hotly contested point, as
Sherbrooke alleges that Defendants intentionally destroyed evidence that would
have tended to show he did not violate the statute.  Regardless of the merits of
that allegation, there is a genuine dispute over the facts relating to probable cause
to stop Sherbrooke for a traffic violation because Sherbrooke alleges that he used
his hazards in accordance with the statute and turned them off before Sachs

began following him on the highway.  Thus, Defendant's Motion for Summary

Judgment is denied as to this issue.

### b.     Cross-Motions as to Count I:  Constitutional Violations Relating to Recording of Sherbrooke's Attorney-Client Communications

Both parties move for Summary Judgment as to Count I of the

Complaint: Violation of 42 U.S.C. § 1983, as to the discrete issue of whether

Sherbrooke's constitutional rights were violated by the audio and videotaping of

his telephone conversation with his attorney.  Plaintiff argues that his clearly

established constitutional rights under the Fourth, Fifth and Fourteenth

Amendments were violated, and that these violations were objectively

unreasonable.  The Individual Defendants assert qualified immunity.

### i.     Fourth Amendment

The Fourth Amendment protection against unreasonable searches of the

person provides a clearly established right to be free from invasion of privacy.

Thus, the Court must examine whether there is a genuine issue of material fact as

to whether the officers should have know that their alleged conduct violated

Sherbrooke's established right to be free from unreasonable search.

Sherbrooke argues that his motion for summary judgment should be

granted because Defendants' actions constitute an unreasonable search in

violation of the Fourth Amendment.  Sherbrooke claims an expectation of privacy

in his phone call with his attorney, noting that even the confidentiality of

prisoners' attorney communications are protected.  Although he was in police custody and in the presence of the officers during the conversation, Sherbrooke urges that there were no precautions he could take to keep his conversation secret while in custody—the police controlled the phone, their own location and his location.  Thus, Sherbrooke maintains that he did not consent to the search.  First, he notes that he was not aware that he was videotaped until the very end of the conversation, although he was aware that Sachs could hear his conversation.  Additionally, Sherbrooke argues that consent must be voluntarily given and cannot be implied by failure to object or by mere submission to a claim of lawful authority.

Defendants counter that there was no Fourth Amendment violation because Sherbrooke's conversation was conducted in the open, with Sachs and Leabo present.  Thus, Sherbrooke knowingly exposed his conversation to the officers and thus had no expectation of privacy in the conversation.  Defendants also argue that Sherbrooke consented to the search when he found out that he was being recorded and stated, "That's fine."

The Fourth Amendment protects against unreasonable searches and seizures.  The Fourth Amendment protects people, not places.  <u>Katz v. United States</u>, 389 U.S. 347, 511 (1967).  Thus, what a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."  <u>Id.</u>  Conversation is within Fourth Amendment's protections and use

of electronic devices to capture it is a "search" within meaning of Amendment. Berger v. New York, 388 U.S. 41, 51 (1967). However, the claimant must have a reasonable expectation of privacy that is recognized by society. Minnesota v. Olson, 495 U.S. 91, 98 (1990).

In this case, society recognizes the importance of privacy in communications with an attorney. The "attorney-client privilege is one of the oldest recognized privileges for confidential communications . . . The privilege is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests.'" Swindler & Berlin v. United States, 524 U.S. 399, 403 (1998). Thus, it is reasonable to expect that a conversation with attorney would be private. See Lanza v. New York, 370 U.S. 139, 143-44 (1962). ("[E]ven in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.")

A search authorized by consent is wholly valid. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). The question is whether consent is voluntarily given. Id. at 223. An individual may validly consent to an otherwise impermissible search if, in the totality of circumstances, consent is freely and voluntarily given, and not the product of implicit or explicit coercion. United States v. Rambo, 789 F.2d 1289, 1296 (8th Cir. 1986). "Although the fact of custody, alone, does not render consent involuntary, the government bears a heavy burden of proving that

consent granted by an individual under arrest was not the product of coercion."
Id. Whether consent was voluntarily given is a question of fact.  Id. at 1297.  See
also United States v. Jaras, 86 F.3d 383, 390 (8th Cir. 1996) ("We do not think
that consent may reasonably be implied from Jaras's silence or failure to object
because Officer Mitchell did not expressly or impliedly ask for his consent to
search.")

Summary judgment is granted in Sherbrooke's favor as to this claim.  He
had a clearly established right of privacy in his conversation with his attorney.
This right was violated by the unconsented search performed by the officers, who
should have known that their conduct violated Sherbrooke's Fourth Amendment
rights.  As to Defendants' argument that Sherbrooke failed to make efforts to
protect the privacy of his call, there was nothing he could do while in a situation
controlled by the officers.  As in Jaras, consent cannot be reasonably implied from
Sherbrooke's failure to object where Sachs did not ask for his consent to execute
the search.  Accordingly, Sherbrooke is entitled to summary judgment as to his
claim that the Individual Defendants' violated his Fourth Amendment right by
recording his conversation with his attorney.

### ii.    Fifth Amendment

In this case, the Fifth Amendment protection against self-incrimination
provides a clearly established right.  Thus, the Court must examine whether there
is a genuine issue of material fact as to whether the officers should have known

that their alleged conduct violated Sherbrooke's established privilege against self-incrimination.

Sherbrooke alleges that because his conversation with his attorney was recorded, he was compelled to be a witness against himself in contravention of the Fifth and Fourteenth Amendments.  He argues that a custodial interrogation took place in which he was forced to self-incriminate, because acts by the police that are reasonably likely to elicit an incriminating response are considered interrogation.  Thus, Sherbrooke claims that although he was not questioned directly by police, their actions in recording his private conversation with counsel forced him to self-incriminate.  He maintains that even though the recording was not used against him because the charges were dismissed, his fundamental right against self-incrimination was nonetheless violated because he was initially charged with a crime, even though the charges were dropped.  Finally, he notes that he never waived his Fifth Amendment privilege.

The Fifth Amendment privilege against self-incrimination provides that police may not effectuate a custodial interrogation without a waiver of the privilege because no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V; <u>Miranda v. Arizona</u>, 384 U.S. 436, 444-45 (1966).  The privilege against self-incrimination is applicable to the States through the Fourteenth Amendment's Due Process clause.  <u>Malloy v. Hogan</u>, 378 U.S. 1, 6 (1964).  Although interrogation usually involves questioning

by the police, other acts reasonably likely to elicit an incriminating response may also constitute interrogation.  See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980) (holding that interrogation may include any words or actions by police that they should know are reasonably likely to elicit an incriminating response from the suspect).

Defendants correctly point out that the Fifth Amendment is "focused on the use in a criminal case of a defendant's compelled, self-incriminating testimony." Id.  In Chavez v. Martinez, 538 U.S. 760 (2003), the Supreme Court determined that the defendant could not allege a violation of his right against self-incrimination because he was "never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case."  Id. at 766. Although the opinion did not determine the "precise moment when a 'criminal case' commences," the Court stated that it is not "until the self-incriminating statements are used in a criminal case that a violation of the Self-Incrimination Clause occurs."  Id. at 767; see also Maddox v. Davis, 164 Fed. Appx. 559, 560 (8th Cir. 2005) (unpublished) (affirming dismissal of Section 1983 claim alleging Fifth Amendment violation where appellant did not allege that statements he made during the conversation had been used against him in a criminal trial).

Sherbrooke was not prosecuted on the charges initially brought against him.  Accordingly, summary judgment is granted in favor of the Individuals Defendants as to this claim because Sherbrooke has not established that a

violation of the Fifth and Fourteenth Amendment occurred, as there is no evidence that his conversation was ever used against him.

### iii.    Due Process

Sherbrooke's due process claims focus only on his defective Sixth Amendment claim and the attorney-client privilege, as his rights under the Fourth and Fifth Amendments are argued as discrete claims under Section 1983, as discussed above.  The Court must apply the principle that "[w]here a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266 (1994) (quotation omitted); see also United States v. Lanier, 520 U.S. 259, 272, n. 7 (1997).  Accordingly, because the Court finds that Sherbrooke's Fourth Amendment rights were violated by the recording of his conversation with his attorney, the Court need not consider Sherbrooke's claim involving the same conduct under the Fourteenth Amendment, as it is "covered by" the Fourth Amendment.  County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998).

Nonetheless, the Court notes that the Sixth Amendment right to counsel does not attach until the commencement of formal judicial proceedings, "or until the driver faces a critical decision regarding chemical testing." See Kirby v. Illinois, 406 U.S. 682, 689 (1972) (right to counsel attaches when adversarial

judicial criminal proceedings have begun).  The process of testing in this case was an investigatory stage, which preceded the decision to prosecute.  Thus, Sherbrooke has no protected Sixth Amendment interest in the privacy of his conversation with his attorney.

Sherbrooke's liberty interest in the attorney-client privilege is properly addressed by the Court's finding that his Fourth Amendment right to privacy in his communications with his attorney was violated.  Accordingly, the Individual Defendants' motion for summary judgment as to this claim is granted.

### 2. Cross-Motions for Summary Judgment as to Count I: Liability of the City Under Section 1983

In his motion for partial summary judgment, Sherbrooke alleges that the City is liable for constitutional violations under Section 1983 because the unconstitutional actions of the individual officers reflected a City policy of deliberate indifference to constitutional violations.

Defendants argue that Sherbrooke has presented no evidence of a pattern of unconstitutional misconduct, and that a single incident is not a custom or practice.  Thus, Sherbrooke has not shown deliberate indifference or a policy of inadequate training of police officers.

Under Section 1983, a municipality may be held liable for a policy that causes the deprivation of the right protected by the constitutional or federal law. Monell v. Dep't of Social Servs. of New York, 436 U.S. 658 (1978).  To prevail on

a <u>Monell</u> claim, the plaintiff must show 1) a continuing, persistent, widespread pattern of unconstitutional misconduct by municipal employees; 2) deliberate indifference to, or tacit authorization of the conduct by policymaking officials; and 3) plaintiff was injured by the policy.  <u>Mettler v. Whitledge</u>, 165 F.3d 1197, 1204 (8th Cir. 1999).  Plaintiff must prove that municipal policy or custom was the "moving force [behind] the constitutional violation."  <u>Id.</u>  In addition, proof of a single incident of unconstitutional activity is insufficient to impose liability under <u>Monell</u>, unless there is proof that the violation was caused by the policy. <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 824-25 (1985).  Deliberate indifference "may be shown by a failure to train, or by conducting a training program in a grossly negligent manner so that police misconduct inevitably occurs."  <u>Patzner v. Burkett</u>, 779 F.2d 1363, 1367 (8th Cir. 1985) (citation omitted).  Liability may only be imposed upon a municipality for failure to train its police force if it does so in a grossly negligent manner, so that it inevitably results in police misconduct, and so that the municipality may be said to have authorized the violations. <u>Warren v. City of Lincoln, Nebraska</u>, 816 F.2d 1254, 1263 (8th Cir. 1987).

Sherbrooke has presented sufficient evidence from which a jury could reasonably find the existence of a municipal custom of audio and videotaping detainees' private conversations with their attorneys, in violation of the Fourth Amendment.  Officer Leabo described this procedure as "standard operating procedure," as did Police Chief Fox.  According to Fox, the city attorney was

aware of the policy.  (Leabo Dep. 28; Fox Dep. 25.)  In addition, there is sufficient

evidence from which a jury could determine that the City's failure to train its

employees exhibits a deliberate indifference to such constitutional violations, and

that Sherbrooke was injured by this deliberate indifference.  Accordingly, the

City's motion for summary judgment is denied as to Sherbrooke's claim that the

City is liable for deliberate indifference to Fourth Amendment violations caused

by a custom of recording detainees' private conversations with attorneys.

However, Plaintiffs remaining claims of the City's deliberate indifference to other

alleged constitutional violations are dismissed because Plaintiff has not raised

genuine issues of fact as to those claims.

### C.      Cross-Motions for Summary Judgment as to Count VI: Violation of Minnesota Statute § 481.10

Both parties move for summary judgment as to Count VI of the

Complaint: Violation of Minn. Stat. § 481.10.

Minnesota Statute Section 481.10 codifies a restrained person's right to

consult with an attorney.  Subdivision 1 states, in relevant part that except in

cases where imminent danger of escape or injury exists, officers "shall admit any

attorney retained by or on behalf of the person restrained . . . to a private

interview at the place of custody."  Subdivision 2 states that except in cases of

imminent danger of injury or escape, officers with custody of a restrained person

"shall provide private telephone access to any attorney retained by or on behalf of

the person restrained . . .   Reasonable telephone access under this subdivision shall be provided following the request of the person restrained and before other proceedings shall be had regarding the alleged offense causing custody."

Sherbrooke claims that it is undisputed that his private telephone call to his attorney was video and audio taped in contravention of this statute.  Sherbrooke argues that if a private room is available, Minnesota law requires that it should be provided.  Sherbrooke argues it does not matter that the usual remedy for a violation of the statute is exclusion of evidence obtained by that violation, because he is merely seeking a determination that his rights were violated and that he is entitled to resulting damages.

In State Dept. of Public Safety v. Kniesel, the Minnesota Supreme Court concluded a private room should be provided, if available.  251 N.W. 2d 645, 649 (Minn. 1977).  However, in Minnesota Department of Public Safety v. Held, 246 N.W. 2d 863 (Minn. 1976), the Minnesota Supreme Court concluded that "the driver's rights are sufficiently safeguarded by a rule which forbids the use in evidence of any statements made by defendant to his counsel over the telephone which are heard by police.  Such a rule satisfies the privacy requirement of Minn. St. 481.10."  Id. at 864.  Similarly, the court in Commissioner of Public Safety v. Campbell, 494 N.W. 2d 268, 269 (Minn. 1992), found that "police do not have to provide a DWI arrestee with a private telephone" because the arrestee's rights will

be protected by the exclusionary rule.  See also Koester v. Commissioner of Public Safety, 438 N.W. 2d 725, 727 (Minn. Ct. App. 1989).

Defendants' motion for summary judgment is granted as to this claim, because it is clearly established under Minnesota law that the only remedy for a violation of the statute is exclusion at trial.

### D.    State Tort Law Claims

The Individual Defendants claim that they are shielded from liability for the state law claims by official immunity, and that likewise, the City is protected from vicarious liability for the acts of the individual Defendants.  However, as the Court dismisses the remaining state law claims on the merits, this argument need not be reached.

### 1.    False Arrest

Defendants move for summary judgment as to Count III of the Complaint: False Arrest.  An action for false arrest requires 1) an arrest performed by defendant and; 2) the unlawfulness of such arrest.  Lundeen v. Renteria, 224 N.W. 2d 132, 135 (Minn. 1974).  An arrest is lawful if it was made with probable cause.  Id. at 136.  Probable cause is defined as "a reasonable ground in suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty."  State v. Harris, 121 N.W. 2d 327, 330 (Minn. 1963).  Ordinarily, the issue of whether there was probable cause to arrest is an issue of fact.  Johnson v. Morris, 453 N.W.2d 31, 35 (Minn. 1990).

However, when the facts surrounding the incident can lead to but one conclusion, the court may resolve the issue as a matter of law.  <u>Id.</u> (citing <u>Lundeen</u>, 224 N.W. 2d at 135).

The Court finds that Sherbrooke has not raised an issue of material fact as to the existence of probable cause to arrest him.  It is undisputed that when Sherbrooke was pulled over he admitted to Sachs that he had consumed alcohol prior to driving his vehicle.  There is no evidence that Sachs failed to properly administer the field sobriety tests, nor is there any evidence that Sachs did not properly administer the PBT test.  Although Sherbrooke claims that Sachs told him that he "failed" the test, rather than providing him with the digital reading of the device, there is no evidence that Sachs fabricated the results of the test or tampered with the device.  Accordingly, because there is no evidence that these tests were improperly administered, Sachs had probable cause to arrest Sherbrooke for a DWI.  Upon the search incident to that arrest, the loaded firearm was discovered, which provided probable cause to arrest Sherbrooke pursuant to Minnesota Statute § 624.7142.   Accordingly, there was probable cause to arrest Sherbrooke and Defendants' motion for summary judgment as to Count III of the Complaint: False arrest, is granted.

## 2.    Malicious Prosecution

Defendants move for summary judgment as to Count IV of the Complaint: Malicious Prosecution.

The elements of a malicious prosecution claim are:

(1)     The suit must be brought without probable cause and with no reasonable ground on which to base a belief that the plaintiff would prevail on the merits;

(2)     The suit must be instituted and prosecuted with malicious intent; and

(3)     The suit must ultimately terminate in favor of the defendant.

Stead-Bowers v. Langley, 636 N.W. 2d 334, 339 (Minn. Ct. App. 2001) (citation omitted).

The Minnesota Supreme Court has stated that malicious prosecution actions are judicially disfavored because of a public policy favoring prosecutions.  Id. Where the facts are undisputed, the issue of probable cause is a matter of law for the court to decide.  First Nat'l Bank v. Marquette Nat'l Bank, 482 F.Supp. 514, 523 (D. Minn. 1979); Allen v. Osco Drug, Inc., 265 N.W. 2d 639, 642 (Minn. 1978).  Malice may be inferred from a lack of probable cause, although the Minnesota Supreme Court has stated that it is not a necessary inference.  Allen, 265 N.W. 2d at 645 (citation omitted).

As stated above, there was probable cause to arrest Sherbrooke for violations of Minnesota law.  The facts are undisputed that Sherbrooke failed the Intoxilyzer test.  It is also undisputed that a loaded pistol was found in Sherbrooke's truck.  Although Sherbrooke disputes whether Sachs had probable cause to pull him over and whether Sachs administered the Intoxilyzer test properly, the issue is whether Defendants had probable cause to charge Sherbrooke with violations of the relevant state statutes.  Undoubtedly, they did.

Moreover, malicious prosecution claims are judicially disfavored under Minnesota law.  Thus, summary judgment is granted as to this claim.

### 5.    Common Law Conspiracy

Defendants move for summary judgment as to Court VII of the Complaint: Common Law Conspiracy.  Sherbrooke alleges that Defendants conspired to falsely arrest and maliciously prosecute him.  Thus, the Court's decision on this claim is dependent on the Court's determination as to Sherbrooke's false arrest and malicious prosecution claims.  Because summary judgment is granted in favor of Defendants as to those claims, Defendants' motion for summary judgment is also granted as to Plaintiff's conspiracy claim.

Accordingly, it is **HEREBY ORDERED**:

1.    Plaintiff's Motion for Partial Summary Judgment [Docket No. 24] and Defendants' Motion for Summary Judgment [Docket No. 41] are **DENIED IN PART** and **GRANTED IN PART** as follows:

  a.  Count I: violation of 42 U.S.C. § 1983:

    i.  Remains as to the issue of whether there was probable cause to stop Plaintiff and as to the issue of whether the City is liable for constitutional violations under Section 1983 because the unconstitutional actions of the individual officers reflected a City policy of deliberate indifference to constitutional violations.

    ii.  Plaintiff's Summary Judgment Motion is **GRANTED** as to the issue of whether Defendants violated his Fourth Amendment rights by recording his conversation with his

attorney.  The issue of damages remains to be determined at trial.

   iii.  Defendants' Summary Judgment Motion is **GRANTED** as to the issues of whether Plaintiff's Fifth Amendment, and Fourteenth Amendment rights were violated.

b.  Count II: Conspiracy in Violation of 42 U.S.C. § 1985 is **DISMISSED**.

c.  Count III: False Arrest is **DISMISSED**.

d.  Count IV: Malicious Prosecution is **DISMISSED**.

e.  Count V: Negligent Infliction of Emotional Distress is **DISMISSED**.

f.  Count VI: Violation of Minn. Stat. § 481.10 is **DISMISSED**.

g.  Count VII:  Common Law Conspiracy is **DISMISSED**.

h.  Count VIII: Vicarious Liability is **DISMISSED**.

Dated:  November 6, 2006             s / Michael J. Davis
                                             Judge Michael J. Davis
                                           United States District Court